(110 App. Div. 403.)

GAGE v. CITY OF NEW YORK et al.

(Supreme Court, Appellate Division, First Department. December 30, 1905.)

1. MUNICIPAL CORPORATIONS—PUBLIC IMPROVEMENTS—CONTRACTS—INJUNCTION BY TAXPAYER.

Where, in a taxpayer's action to restrain a city from entering into a contract for improvements, plaintiffs showed that the contract about to be entered into was illegal, and plaintiff was, in fact, a taxpayer, he was entitled to the favorable consideration of the court, though he might have been moved by a private grievance to bring the action, and was the secretary of a corporation, which was an unsuccessful competitor of the successful bidder.

[Ed. Note.—For cases in point, see vol. 36, Cent. Dig. Municipal Corporations, § 2167.]

2. SAME—PROPOSALS FOR BIDS—AFFIDAVITS—DEFECTS—WAIVER.

An affidavit accompanying a proposal for the construction of a public improvement was verified before a notary in Philadelphia. It was made on a blank form furnished by the city of New York, and had printed thereon, as a venue for the verification, "The City, County, and State of New York." The notary, without canceling such venue, filled out a jurat, and then had a prothonotary attach a certificate and stamp his official seal, "Court of Common Pleas, Philadelphia, Penna." over the printed venue, which the notary adopted as a venue. Held, that the affidavit so verified was merely irregular, and that the irregularity was properly waived.

[Ed. Note.—For cases in point, see vol. 2, Cent. Dig. Affidavits, § 57.]

3. SAME—GREATER NEW YORK CHARTER—CONSTRUCTION.

Under Greater New York Charter, § 419, Laws 1901, p. 186, c. 466, providing that whenever any work shall involve an expenditure of more than $1,000, the same shall be by contract under such regulations as shall be established by ordinance or resolution of the board of aldermen, the plans and specifications for a public work, the cost of which exceeds $1,000, must be of sufficient definiteness to require competition on every material item, and must state the quantity of work required as definitely as practicable.

[Ed. Note.—For cases in point, see vol. 36, Cent. Dig. Municipal Corporations, §§ 829, 857.]

4. SAME—SPECIFICATIONS—MATERIALS—CERTAINTY.

A contract by the city of New York for the construction of a bridge specified that certain portions thereof were to be "high carbon steel or nickel steel," but the specifications nowhere disclosed how much nickel steel and how much high carbon steel was to be used, nor was it certain whether the contractor or the commissioner of bridges was to determine which should be furnished. At the time the contract was made there was a difference of between $30 and $35 per ton in the cost of high carbon and nickel steel, and defendants admitted that if nickel steel was used only 16,247,000 pounds would be required, while if carbon steel was used 19,408,000 pounds would be required. Held, that such contract was il-

legal because of indefiniteness of the materials to be used, so that there could be no actual competition in bidding, as required by Greater New York Charter, § 419, Laws 1901, p. 186, c. 466.

[Ed. Note.—For cases in point, see vol. 36, Cent. Dig. Municipal Corporations, §§ 829, 857.]

5. SAME—CHANGE OF MATERIALS—POWER OF COMMISSIONER.

Where a contract for the construction of a bridge by the city of New York authorized changes in the character of the work and materials, which might increase the cost, and provided that the engineer should have exclusive power to determine the additional amount that should be paid by the city therefor, the intent being to reserve general power to change the materials and work, requiring the contractor to make any changes as if expressly required by the contract, the same was illegal as in violation of Greater New York Charter, § 419, Laws 1901, p. 186, c. 466, requiring all work involving an expenditure of over $1,000 to be let to the lowest bidder.

[Ed. Note.—For cases in point, see vol. 36, Cent. Dig. Municipal Corporations, § 854.]

6. SAME—SPECIAL MATERIALS.

A contract by a city for the construction of a bridge was not illegal, as a matter of law, because a particular kind of steel was specified, which required all bidders to purchase the materials from a certain producer.

[Ed. Note.—For cases in point, see vol. 36, Cent. Dig. Municipal Corporations, § 855.]

Ingraham, J., dissenting.

Appeals from Special Term, New York County.

Suit by Peter A. Gage against the city of New York and others. From a decree in favor of plaintiff, defendants prosecute separate appeals. Affirmed.

Separate appeals by defendants the city of New York and George E. Best, as commissioner of bridges of the city of New York, and by defendant the Pennsylvania Steel Company from an order continuing a temporary injunction restraining the city and the commissioner of bridges from entering into a contract with the Pennsylvania company for the construction of the superstructure of the Manhattan bridge over the East river. The action is by a taxpayer, and it is brought pursuant to the provisions of section 1925 of the Code of Civil Procedure, and chapter 301, p. 620, of the Laws of 1892 to enjoin the defendants from making a fraudulent and illegal contract involving a waste of public funds.

Proposals for the construction of the entire work for a gross sum pursuant to specifications, drawings, and a form of contract previously prepared and on file in the department of bridges were invited in due form, pursuant to the requirements of section 419 of the charter of Greater New York, Laws 1901, p. 186, c. 466, which covered the letting of the work. The Pennsylvania Steel Company in its proposal offered to do the work for $7,240,739, and its proposal was the lowest received. The plaintiff is the secretary of the John Pierce Company, which corporation was an unsuccessful bidder; its proposal being $200,000 more than that of the Pennsylvania company.

Four grounds of illegality in the proposed contract are assigned by the respondent: (1) That the proposal and specifications and proposed contract, which are made a part thereof, were so drawn as to prevent free and fair competition; (2) that the right is reserved to make a new and substantially different contract with the successful bidder; (3) that discretionary power, that can only be exercised by the head of the department, is delegated to the engineer of the bridge department; and (4) that the bid of the Pennsylvania Steel Company was not verified by the oath of the bidder, as required by section 346 of the ordinances of the city.

Section 419 of the city charter, so far as material, is as follows: "Whenever any work is necessary to be done to complete or perfect a particular job, or

any supply is needful for any particular purpose, which work or job is to be undertaken or supply furnished by the city of New York, and the several parts of the said work or supply shall together involve the expenditure of more than $1,000, the same shall be by contract, under such regulations concerning it as shall be established by ordinance or resolution of the board of aldermen. * * *"

The ordinance regulating the letting of the work is section 346 which, so far as material, provides as follows: "The proposals for estimates shall be in such form as may be prescribed by the department making the same, and shall contain the following particulars: * * * (2) They shall state the quantity and quality of supplies or the nature and extent, as near as possible of the work required."

The clauses of the proposed contract and of the specifications upon which the fraud and illegality are predicated are as follows:

### Clauses of Contract.

"(H) The engineer shall have the right of correcting any errors or omissions in the specifications and drawings, when such correction is necessary for the proper completion of the work herein stipulated, and for the proper fulfillment of their intention; the action of such correction to date from the time that the engineer gives due notice thereof, it being further understood that if such correction shall increase the cost of the work to the contractor it shall be considered as extra work as hereinafter provided for.

"(I) Any doubt as to the meaning of these specifications, or any obscurity as to the wording of them, will be explained by the engineer, and all directions and explanations requisite or necessary to complete, explain, or make definite any of the provisions of the specifications and give them due effect will be given by the engineer.

"(J) To prevent all disputes and litigations, the engineer shall in all cases determine the amount or the quality of the several kinds of work, which are to be paid for under this contract, and he shall determine all questions in relation to said work, and the construction thereof; and he shall in all cases decide every question which may arise relative to the execution of this contract on the part of the contractor, and his estimate and decision shall be final, conclusive, and binding, and such estimate and decision, in case any question shall arise, shall be a condition precedent to the right of the contractor to receive any money under this agreement.

"(K) The engineer shall be, and is hereby, authorized to appoint such inspectors or other persons as he shall deem necessary to inspect the materials and labor furnished and done under this agreement, and to see that the same correspond with the specifications, plans, and drawings, and the terms and intent thereof."

"(DD) The contractor shall not ask, demand, sue for, or recover for any materials furnished or work done under this contract, any extra compensation beyond the amounts payable for the work herein enumerated, which shall be actually performed, and which are herein agreed upon, unless the same is approved in writing by the engineer and the commissioner, and a price therefor agreed upon before the work is begun.

"(EE) No claim for extra or additional work or materials shall be made or allowed to the contractor, unless before the performance of such extra or additional work the commissioner shall have first authorized the same in writing, and the price or prices to be paid therefor shall first have been agreed upon in writing between the commissioner and the contractor, and the same shall have been done or furnished under a written order from the commissioner given before the performance of such extra or additional work, or the furnishing of such extra or additional materials. The aggregate price to be paid for extra or additional work or materials so authorized or ordered shall not exceed five per cent. (5 per cent.) of the contract price or total cost of the work and materials. All claims for extra or additional work or materials in any month shall be made to the engineer, in writing, before the 15th day of the following month, and failing to make such claim within the time required the rights of the contractor to extra pay for such extra, or additional work or materials, shall be deemed to have been waived and forfeited.

"(FF) If, before the completion of the work contemplated herein, it shall become necessary to do any other or further work than is provided for in this contract, the contractor will not in any way interfere with or molest such other person or persons as the commissioner may employ to do such work, and will suspend such part of the work herein specified, or will carry on the same in such manner as may be ordered, by the engineer, to afford all reasonable facilities for doing such work; and no other damage or claim by the contractor therefor shall be allowed, except such extension of the time specified in this contract for the performance thereof, as the comissioner may deem reasonable and shall so certify in writing.

"(GG) This contract and the specifications herein contained, and the plans hereafter referred to, may be modified and changed from time to time as may previously be agreed to in writing between the parties hereto, in a manner not materially affecting the substance thereof, or increasing the price to be paid, in order to carry out and complete more fully and perfectly the work herein agreed to be done and performed.

"(HH) If the conditions, at any time prevailing, require changes or alteration to be made, such changes shall be made and the work and materials required to be furnished to effect such changes, shall be made, done, and furnished by the contractor as under and a part of this agreement, and if such changes increase or decrease the cost of the work to the contractor, of which the engineer shall be sole judge, a reasonable addition to or deduction from the contract price shall be made and determined by the engineer. If the work and materials required by such changes shall be different from those required or specified, or reasonably implied by the terms and conditions set forth in this contract, specifications, plans, and bid, then the increased or decreased cost of such work and materials shall be the subject of a supplemental written agreement by and between the parties as herein provided, by which the actual cost thereof shall be determined and fixed."

"(RR) The city shall not, nor shall any department or officer thereof, be produced or estopped by any return or certificate made or given by the commissioner, any engineer, or other officer, agent, or appointee of the city, under any provision of this agreement from at any time [either before or after the final completion and acceptance of the work and payment therefor, pursuant to any such return or certificate] showing the true and correct amount and character of the work done and materials furnished by the contractor, or any other person under this agreement, or from showing at any time that any such return or certificate is untrue and incorrect, or improperly made in any particular, or that the work and materials, or any part thereof, do not, in fact, conform to the specifications; and the city shall not be precluded or estopped, notwithstanding any such return or certificate and payment in accordance therewith, from demanding and recovering from the contractor such as it may sustain by reason of his failure to comply with the specifications."

### Clauses of Specifications.

"(20) All structural steel, excepting that to be used in the architectural work, ladders, gratings, and such similar minor details as the engineer may specifically exempt from the exclusive use of such steel, shall be made in an open-hearth furnace, lined with silica.

"(21) The stock from which this steel is made shall consist of pig iron or of washed pig, or of a combination of both. Acid open-hearth scrap resulting from previous heats for this work may be used in quantities not exceeding twenty-five per cent. (25%).

"(22) Washed pig shall not be decarbonized below 1.50 per cent. during washing, and an analysis for carbon, phosphorus, and sulphur shall be made from each cast. During the reduction of steel in the open-hearth furnace, decarbonization below 0.12 per cent. of carbon will not be allowed."

"(42) All nickel steel shall be made in an open-hearth furnace lined with silica. It shall be made in the same manner, and of the same stock as specified for rolled carbon steel, with the addition of nickel.

"(43) The ladle test shall contain not less than 3.25 per cent. pure nickel. * * *"

"(89) No lime or other basic material other than iron ore shall be added to the furnace charge of acid open-hearth steel during any stage of the melting or pouring of the steel."

"(254) In the suspended superstructure, the main parts of the chords and of the diagonal web members of the trusses; the gusset plates connecting the diagonal web members to the chords and the chord splices shall be made of nickel steel, or of high carbon steel of the quality hereinbefore specified. All the rest of the material shall be made of medium carbon steel, except as otherwise indicated in the specifications or on the plans."

Argued before O'BRIEN, P. J., and PATTERSON, INGRAHAM, LAUGHLIN, and CLARKE, JJ.

Theodore Connoly, for appellants City of New York and Best, Commissioner of Bridges.

Edward M. Shepard, for appellant Pennsylvania Steel Co.

Thomas F. Conway, for respondent.

LAUGHLIN, J. The first ground upon which we are asked to reverse the order continuing the injunction is that the action is brought in bad faith. The suggestion requires consideration in weighing the evidence, and, in a doubtful case might determine the view of the court on the facts. The plaintiff, however, shows that he is qualified as a taxpayer to bring the action. It is to be borne in mind that few other than the public officials and bidders and those employed by them understand or become acquainted with the plans and specifications of a work of this magnitude and intricacy involving as it does special skill and knowledge. If there be a disposition to show favoritism and special provisions are incorporated in the specifications that will enable that to be done, those who have come in contact with the officials and their representatives and have examined the plans and specifications with a view to acquiring knowledge to enable them to submit a proposal may be best qualified to show it; and when they present a meritorious case they should be commended rather than condemned. If the plaintiff in a taxpayer's action shows fraud or collusion or an illegal contract, he is entitled to the favorable consideration of the court, although he may have been moved by some private grievance to bring the action. The plaintiff's connection, therefore, with an unsuccessful competitor of the Pennsylvania Steel Company cannot defeat the action, and, as already stated, its only relevancy is that it is to be considered in weighing the evidence.

It is no doubt a great hardship and at first blush it appears quite unfair to a successful bidder to have its proposal rejected and the work readvertised. After proposals have been invited and submitted in good faith they should not be rejected by the officials without good cause, and their rejection may not be compelled by the court without proof of fraud or illegality in the proposed contract. Where, however, the action is brought before the contract is let or any rights have become fixed, the court may enjoin the making of the contract with more freedom than would be warranted had the contract been executed.

The objection that the proposal was not duly verified is without merit. Officials on opening proposals for public work should ordinarily reject those which do not conform to the requirements of the advertise-

ment. Provisions requiring that such proposals shall state who are interested therein and that there is no collusion with the public officials, who are to award the contract, or their representatives and the like requiring an affidavit as to their truthfulness, are important, and should not be overlooked. In the case at bar the proposal was in fact verified before a notary public in the city of Philadelphia. It was made on a blank form prepared and furnished by the commissioner of bridges, and had printed thereon as a venue for the verification "the City, County, and State of New York." The notary without cancelling this printed venue and writing in a new one, duly filled out a jurat and subscribed his name and official title, and then had a prothonotary attach a certificate and stamp his official seal, "Court of Common Pleas, Philadelphia, Penn." over the printed venue, and the notary says he then adopted the same and treated that as a venue. In these circumstances the commissioner of bridges was not obliged to reject the proposal. At most it was irregular; but the irregularity could be waived (McCord v. Lauterbach, 91 App. Div. 315, 86 N. Y. Supp. 503), and we think it was the duty of the commissioner to waive it, and receive this proposal which was $200,000 lower than any other submitted.

The provisions of the statute and ordinance with respect to the preparation of plans and specifications are very meagre. Ordinarily the Legislature incorporates in municipal charters a provision requiring the preparation in advance, of definite plans and specifications as to work, which is required to be let by public competitive bidding; but this does not appear to have been done concerning the city of New York. The courts long ago for the protection of the public were obliged to spell out of these somewhat indefinite provisions a requirement that there should be plans and specifications with reasonable definiteness; and in the various amendments and revisions of the charter clear and definite express legislation does not appear to have been enacted. The original provisions were re-enacted, subsequently, substantially as they existed, and for their true meaning recourse must be had to the decisions of the courts; for literally the ordinance would seem to provide that the bidder is to furnish the plans and specifications. The courts have, however, held that plans and specifications of sufficient definiteness to require competition on every material item are required and must state the quantity of work required as definitely as is practicable. Matter of Merriam, 84 N. Y. 596; Matter of Rosenbaum, 119 N. Y. 24, 23 N. E. 172; Matter of Anderson, 109 N. Y. 554, 17 N. E. 209. Definite plans and specifications are necessary to insure the economical performance of the work by getting the best results from competitive bidding. Another object of letting public work to the lowest bidder after inviting public proposals is to prevent "favoritism and jobbing" on the part of public servants intrusted with authority to make contracts for public work and supervise the execution thereof. Brady v. Mayor, 20 N. Y. 316.

The learned counsel for the defendants very properly drew attention to the magnitude and complexity of this work, and to the disastrous consequences in the destruction of life and property that may attend any mistake or error with respect to the nature of the material used or the workmanship in the construction of the bridge. Attention

is also drawn to the fact that this contract is only for the superstructure, which is to be erected on columns of masonry already constructed under another contract; and that in some instances in the past, it has been found that the foundations of bridges were insufficient to support the superstructure, or gave way thereunder. We are admonished that unforeseen accidents of this or a like nature are possible, and are very properly asked to examine the specifications, drawings, proposal, and contract having those things in mind.

Counsel for the plaintiff urges that the contract is invalid on account of the alternative provision of paragraph 254 of the specifications with respect to whether high carbon steel or nickel steel shall be used for certain parts of the work therein specified. This provision is somewhat blind as to who has the election and is to decide which material shall be selected. It appears by the affidavit of one of the experts presented by the defendants that he had charge of the examination of the specifications, drawings, and contract, and of the preparation of a bid by one of the five who submitted a proposal for the work; and that he understood and interpreted the provision as giving the option to the contractor. The plaintiff, however, alleges and the successful bidder now concedes—the learned judge at Special Term, as stated in his opinion, understood its counsel to contend otherwise, notwithstanding the fact that its general superintendent assisted, as one of the commission, in preparing the specifications and contract —that taking the contract and specifications as a whole, although there is no express provision on the subject, the apparent intention was to give the option to the commissioner of bridges. The specifications and contract not being definite or clear on this point, it will be still open to the contractor to claim that the election rests with it and the engineer will be free to so interpret them. Thus, regardless of which may be the better material, the contractor may be permitted to use that which is the cheaper. It appears that this material will not be needed for two years after the contract is let for the reason that the anchorages, steel towers, and steel cables, also embraced in this proposed contract, must be constructed or substantially constructed first. It was shown on behalf of the plaintiff that the present market price of nickel steel, such as is required by these specifications, is from $30 to $35 per ton more than that of high carbon steel. The specifications prescribe the requirements for both kinds of steel, but neither the quantities nor the dimensions are therein shown or stated; and, for these, reference is made to the drawings which it is conceded only represented the dimensions and quantities that would be necessary if nickel steel should be used. It appears to be conceded that if high carbon steel is used a greater quantity will be required to make as strong and durable a bridge; but it does not appear—not clearly, at least, as it should, as will be shown presently—either by the contract or specifications that the contractor shall furnish the larger quantity of high carbon steel required without extra charge if that material should be selected. The defendants show by affidavits that if nickel steel is used only 16,247,000 pounds will be required, while if carbon steel is used 19,408,000 pounds will be required. There is at present, as has been seen, a great difference in the cost of the material,—over

a quarter of a million dollars,—assuming that the same quantity only is required to be furnished, and a very considerable difference even if the large quantity of carbon steel must be furnished; but it is conceded that on account of the greater bulk and weight, if the larger quantity of carbon steel should be required, the cost of handling it including transportation and putting in place will be more than if nickel steel is used.

It is claimed on behalf of the defendants, and many affidavits are presented tending to show that taking into consideration the fact that if high carbon steel is used a larger quantity will be required, the handling of which will cost more, and more work will be required because the holes for rivets must be drilled, whereas part of them may be punched in nickel steel, and that the inspection of the material while in the process of manufacture will necessarily be very rigorous; the extra costs of nickel steel over high carbon steel would not be more than $7,721 to $10,000. On the other hand, the plaintiff presents affidavits of certain engineers, with less apparent technical education and experience than those offered in behalf of the defendants, tending to show that the additional cost of nickel steel over high carbon steel, even if the contractor should be obliged to furnish the increased quantity of the latter figured on the present prices, would be a very large sum approximating $120,000. It is evident that the difference in cost of material and construction would be much more if the contractor were obliged only to furnish the same quantity of high carbon steel as if nickel steel had been required. The reason assigned by the professional experts for not now definitely specifying one or the other of those materials is that it has only recently been discovered that nickel steel is probably a superior material for this purpose to high carbon steel, owing principally to the fact that greater strength is given with less weight and bulk but that it is still somewhat experimental and has not had a satisfactory practical test for work of this character.

The commissioner testifies that in connection with the construction of the Blackwell's Island Bridge, he is having tests made of the relative value of these materials for this purpose; and that within two years, and before the use of such materials becomes necessary, the result of those tests will be known. That would seem to be a good reason for postponing the letting of this part of the contract if that be reasonably practicable. It is not claimed that there would be any insuperable difficulty in awarding it separately, even if another contractor should be the lowest bidder. It is, however, claimed that it would be quite inconvenient to have another contractor employed on the work toward the finish that being the time when the authorities contemplate having this high carbon or nickel steel work proceed. That seems reasonable and justifies letting the work together to the same contractor and manifestly that course is advisable if it may be done legally and without detriment to the interests of the city from a financial standpoint. It would have been competent in these circumstances to have so framed the specifications and drawings as to show separately the quantity of material required if high carbon steel should be selected and the quantity that would be required if nickel steel should be adopted and then to have the bidders specify separately the amount

for which they would furnish either material and do the work. It is not claimed that there would be any legal objection to this method, or that it would be impracticable. It would be fair alike to the city and the contractor. It may be that no contractor would be the lowest bidder on the whole work whichever of these materials should be used; but, if not, some other plan could be devised for changing the specifications or invitations for proposals, so that it could be determined which proposal is lowest. However, if the contract could not be legally let after inviting proposals with separate estimates on these different kinds of material, because it could not be determined who was the lowest bidder, it seems quite clear that resort to the method that has been adopted could not be had for the purpose of removing the illegality. That would be merely covering it up. It is not a case where it is essential that the city should know in advance the total cost of the work, as if a local assessment were to be made to defray the expense.

Under the provision of the specifications forming part of the proposed contract, a successful contractor could not avail himself of the present market price and presently contract for the material. This could only be done with safety after the commissioner decides which material he will require; and that decision may not be made for two years. It has been sufficiently and satisfactorily shown that at the present market prices of the material there is a substantial difference between the cost to the contractor of the two kinds of material, and that there may be a like or greater difference when the time for the use of the material arrives. It will then rest with the commissioner of bridges to decide which material the contractor shall use, or he may leave it to the contractor. If he interpret the specifications as giving him the right to decide, he may, in good faith, decide that the cheaper material is the better; and the contractor will reap the benefit with no rebate to the city. The difference between the cost of these materials may then be very great. The greater the difference in cost to the contractor the greater the incentive to improperly influence the public officials in deciding on the material the contractor shall be required to use or in leaving the election to the contractor. Thus, we have presented a situation, which it has always been one of the objects of requiring the letting of public work on competitive bidding by public proposals to avoid. We have shown that it was unnecessary to frame this provision of the specifications in the alternative, which necessarily required bidders to figure on the cost of construction with the most expensive of the two materials as the basis for their proposals. We do not wish to be understood as reflecting on the good faith of the public officials in this matter. This decision is to become a rule of law, not merely for the government of the present officials, but for all time, while the statutory law remains the same. If we should sustain this provision of the specifications the door would be opened to collusion between public officials and intending bidders, by which one or more of the bidders might know in advance which material the officials would require under the alternative provision of the specifications, and thereby obtain an undue advantage.

Moreover, if the contract should be awarded on the proposal of the

Pennsylvania Steel Company, a very serious question might arise as to whether it would be obliged to furnish more high carbon steel, if that material should be adopted than is required by the drawings. We do not find that the drawings specify that they are for nickel steel; and it is not apparent that bidders would know whether they are for nickel steel or high carbon steel. That, however, is not the material point. It seems to be conceded that the dimensions and quantities shown by the drawings, so far as they relate to the work to be constructed of either high carbon steel or nickel steel, are the dimensions and quantities esential if nickel steel is used. It appears, as already stated, that the quantity called for by the requirements of the drawings, not specified in gross, but ascertainable by measurements and calculation, is 16,247,000 pounds. Our attention has not been called to any provision of the specifications shedding light on that question, other than paragraph 254 set forth in the statement of facts and paragraphs 255 and 256 which are as follows:

"(255) Connections of chord splices and diagonal web members of the stiffening trusses shall be made with nickel steel rivets, as called for on the plans; or shall be made of equivalent strength with carbon steel rivets by increasing the size or number of the latter.

"(256) The basis of comparison of strength of nickel steel and carbon steel rivets shall be the allowable unit stresses of each given in the table (paragraph 125, page 68 of the specifications), or shall be determined by the engineer after experiments made by the contractor under supervision of the Inspector for this purpose."

It will be observed that here is a specific requirement that certain rivets if of high carbon steel shall be larger or more numerous than those shown on the drawings in order that they shall be as strong as if nickel were used according to the requirements of the drawings. It is not pretended that the rivets specified in said paragraphs 255 and 256 embrace all the high carbon or nickel steel required. The affidavit of Mr. Moore an expert for the plaintiff shows that paragraphs 255 and 256 only relate to a very small part of the material required to be of either high carbon or nickel steel, and this is not controverted. Paragraph 254 expressly requires that:

"The main parts of the chords and of the diagonal web members of the trusses, the gusset plates connecting the diagonal web members to the chords and the chord splices shall be made of nickel steel or high carbon steel."

The rivets specified in paragraphs 255 and 256 are to be used to make the connections of the chord splices and diagonal web members of the stiffening trusses. Manifestly the chords, chord splices, diagonal web members of the trusses and gusset plates will require most of the high carbon steel or nickel steel, and the specified connecting rivets will require but a comparatively small part thereof. There seems therefore to be no clear, if any, requirement, even in the specifications, that if high carbon steel is used that part of the chords, chord splices, diagonal web trusses, and gusset plates which paragraph 254 provides shall be constructed of either nickel steel or high carbon steel, shall be enlarged or increased in number to attain the same strength as would be afforded if nickel were used according to the drawings. It is evident that new drawings would be required if carbon steel should be used and these parts should be thus enlarged. The form of proposal

pursuant to the provisions of the ordinance quoted in the statement of facts required bidders to specify the quantities of the different material upon which they submitted estimates giving the unit and total price on which they figured in making up their bids. The blank forms of proposal, so far as material on this point, contained four columns. The first was headed, "Class of work;" and under this printed in separate items a general description of the work called for and, among others, "Nickel steel or high carbon steel riveted work, pounds." The second column was headed, "total quantity." It was blank, but the defendant steel company filled in the figures, "16,247,400," which is the quantity required to comply with the drawings. The third column was headed "Unit Price" and in that the bidder filled in ".0878," which evidently means the price per pound. The fourth column was headed, "Total Price" and the bidder filled in the figures, "1,426,-522," meaning evidently that it had in making up its gross bid estimated $1,426,522 for this part of the work, and had figured on 16,-247,400 pounds. In these circumstances—if after the contract should be let, the commissioner of bridges should decide to require high carbon steel, and have drawings prepared, enlarging the dimensions or numbers of the parts required to be constructed of one or the other, so as to give the bridge the same strength according to the rivet test prescribed in paragraph 256 as if nickel of the dimensions and as called for by the drawings had been used—it would seem that the contractor might well claim that it was only obliged to furnish the quantity called for by the drawings, and that it would be entitled to extra compensation, both for material and labor above that quantity. And it is not at all clear that such contention would not be sustained. If it were intended to enlarge the other parts, as well as the rivets to be used for such connection, it would seem that it should have been so stated in the specifications, and would have been further stated that in that event new drawings would be prepared. These matters were left altogether too vague and indefinite. This was entirely unnecessary and calculated to mislead bidders and increase the cost of the work. Being of opinion that this paragraph of the specifications and the omission of drawings for high carbon steel would render the proposed contract illegal and that the illegality cannot be obviated by evidence upon the trial, we deem it our duty, in view of the public interest and urgency of the work, to place our decision on the merits as to this point, although there are other grounds upon which the temporary injunction should be sustained. The injunction must therefore be sustained, but since, as we view the case, the work must be relet, other provisions of the contract which are assailed as illegal require comment to the end that the may be so altered that they can be sustained if again attacked.

The learned counsel for the plaintiff contends that clause HH of the proposed contract is illegal, in that it authorizes changes in the character of the work, and in the material which may increase the cost and then unlawfully delegates to the engineer the exclusive right to determine the additional amount that shall be paid by the city, and also authorizes the substitution of other and different material, and other changes in the work without any limitation upon the amount thereof

and provides for a supplemental contract or contracts to cover the price of the same. The defendants claim that the engineer is a mere arbitrator as to whether the changes increase or diminish the cost of the work to the contractor, and how much, and that this provision is analogous to those commonly inserted in such contracts and often sustained by the courts to the effect that an engineer or architect shall determine whether the work has been performed according to the contract and certify to the fact as a condition precedent to the right of recovery on the contract. There is more difficulty, however, with the latter part of the clause. It will be seen by the other provisions of the contract quoted that mistakes and omissions, changes and alterations by mutual consent and extra work and the compensation therefor had been carefully provided for. Counsel for plaintiff rightly contends that the provision for new contracts in the clause HH must have been intended to provide for something not otherwise covered by the contract. It apparently was designed thereby to reserve general authority on the part of the commissioner to change the materials and work, and there is a provision in the fore part of the clause, in effect, requiring the contractor to make any changes he may be called upon to make, as if expressly required by the contract. The learned counsel for the city concedes that this was intended to authorize any change in the contract that might be required in consequence of any unforeseen difficulty, as by the giving way of the supports for the superstructure, or any substitution of material; and also any substitution that might be deemed advisable as the result of the development of scientific knowledge with reference to the construction of work of this character at any time before the material is needed. It appears to be conceded that contract work of this nature involving an expenditure of over $1,000 is required to be let to the lowest bidder by the provisions of section 419 of the charter already quoted. We do not understand it to be contended by counsel for the defendants that there is any statutory or other authority authorizing a new contract involving a greater expenditure than $1,000 without inviting public proposals or a three-fourths vote of the board of estimate and apportionment dispensing therewith. If any substantial change involving an increase of more than $1,000 in the cost should become necessary or be deemed advisable, it is not within the power of the commissioner to negotiate a private agreement therefor with the contractor; but it would become necessary to invite public proposals therefor, unless this should be dispensed with as already stated. This provision of clause HH is therefore both indefinite and misleading. No idea is given bidders of even the nature of the circumstances which may be assigned as the reason for making a material change in the contract and they are given to understand that if there be any change in the material a new contract will be made with them. Attention is not called to the fact that such contract cannot be made with them as matter of right, if it will involve the expenditure of more than $,1000. If the city wishes to reserve the right to cancel the contract, in the event that any unforeseen accident will prevent the performance thereof as contemplated, that should be done by a plain and concise clause. It is claimed that without clause HH the city would guaranty the sufficiency of the plans and

specifications, and become liable to the contractor, in the event that they should prove insufficient, or that the foundation should not sustain the superstructure. There appears to be no good reason why the contractor should take the risk of these contingencies, and requiring him to do so doubtless very materially increases the cost of the work. Provision might well be made limiting the recovery of the contractor in that event to a quantum meruit. Proposals for public work should be invited with reference to the use of specified material in the construction of the work contemplated. Competition is not fostered by a clause reserving the right to change the material and work without any limitation. It is possible to put a construction on clause HH which will make it legal, and doubtless that would be done if the contract had been let; but that would have confined its operations to changes and alterations involving an expenditure of less than $1,000, or if more than that amount, to instances in which the board of estimate and apportionment by the vote required by the charter dispensed with the necessity of inviting public proposals. Only five proposals were received, and the difference between the lowest and the highest is more than $2,000,000. These facts are quite significant, and the cause may be found in these and other indefinite provisions of the specifications and contract which would naturally, we think, deter bidders, and prevent that competition which the statute, as construed by the courts, was designed to require.

The criticism of the specifications as to the method of manufacturing other material to be used in the work, which it is claimed render it necessary for all bidders to purchase the materials from the Carbon Steel Company, and render the proposed contract fraudulent and void, have been, so far as this appeal is concerned, fairly met and overcome by the affidavits presented on behalf of the defendants. The charge of fraud has not been sustained, and the charge of illegality is answered by the case of Knowles v. City of New York, 37 Misc. Rep. 195, 75 N. Y. Supp. 189, affirmed 176 N. Y. 430, 68 N. E. 860, where the court construing these identical provisions in the Williamsburg bridge contract, hold that it could not be said as matter of law that they were illegal, even if the Carbon Steel Company were the only manufacturer of the material.

It follows that the order should be affirmed, with $10 costs and disbursements. All concur, except INGRAHAM, J., who dissents.