(65 Misc. Rep. 609.)

SCHIEFFELIN v. CITY OF NEW YORK et al.

(Supreme Court, Special Term, New York County. January, 1910.)

1. INJUNCTION (§ 77*)—GROUNDS—ACTS OF CITY OFFICIAL.

To warrant the restraining of a contemplated act of a city official, the doing or threatened doing of an illegal act must be shown, as courts will not interfere merely to substitute their judgment or discretion for that of the municipal officers whose duty it is to perform an act the propriety of which is questioned.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 146, 147; Dec. Dig. § 77.*]

2. MUNICIPAL CORPORATIONS (§ 70*)—PUBLIC IMPROVEMENTS—LEGISLATIVE CONTROL.

Laws 1907, c. 670, authorizing the erection of a municipal building at the Manhattan terminal of the New York and Brooklyn Bridge, and removing from the control of the borough president of Manhattan, who, under the charter, would have been in control of the work, all supervision over the construction of the building and transferring it to the commissioner of bridges, who shall act with the approval of the board of estimate and apportionment, under which the exercise of the board of estimate and apportionment of their power, by preparing and approving plans, would deprive the superintendent of buildings of further jurisdiction, is a valid exercise of legislative power.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 170–174; Dec. Dig. § 70.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

3. MUNICIPAL CORPORATIONS (§ 70*)—IMPROVEMENTS—CONSTRUCTION OF STAT- .
UTE.
   The statute (Laws 1907, c. 670) giving the commissioner of bridges the
absolute power to erect, furnish, and equip the building carries with it
the right to do all things essential to the carrying into effect of the main
purpose to be accomplished, including the right to employ an architect
to supervise the work, though the act does not in terms confer such
power.
   [Ed. Note.—For other cases, see Municipal Corporations, Dec. Dig.
§ 70.*]

4. MUNICIPAL CORPORATIONS (§ 370*)—IMPROVEMENTS—PAYMENT UPON CON-
TRACTS—CONSTRUCTION OF CHARTER.
   Greater New York Charter (Laws 1901, c. 466) § 422, providing that
when a contract for public improvements is made, and a certified copy
thereof duly filed with the comptroller, he shall pay to the contractor
from time to time as the work progresses 70 per cent. of the estimated
value of the work actually done, relates to street improvement work, and ·
not to the erection of a municipal building, and the 70 per cent. provided
for is a minimum payment only; the provision being intended for the
protection of the contractor from unnecessary delay, and not a prohibition
against further payments by the city in a proper case.
   [Ed. Note.—For other cases, see Municipal Corporations, Dec. Dig. §
370.*]

5. MUNICIPAL CORPORATIONS (§ 332*)—IMPROVEMENTS—ALTERNATIVE BIDS.
   A contract of a municipal corporation requiring bids for work, whereby
either of two materials could be used, was not illegal as calling for alter-
native bids, where the bids called for were not to contain a single price
for furnishing either material, the choice to be left to some other person,
but separate estimates of costs for each of the two classes of work.
   [Ed. Note.—For other cases, see Municipal Corporations, Dec. Dig. §
332.*]

6. MUNICIPAL CORPORATIONS (§ 992*) — ACTS OF PUBLIC OFFICIAL—RIGHT OF
TAXPAYER.
   Before a plaintiff in a taxpayer's action can be given relief by injunc-
tion against the acts of an official, it must appear that such acts are with-
out power, or that collusion, fraud, or bad faith, amounting to fraud,
exists.
   [Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §
2157; Dec. Dig. § 992.*]

   Action by William J. Schieffelin against the City of New York and
another. On motion to make a temporary injunction permanent. De-
nied.

   J. Hampden Dougherty, for plaintiff.
   Francis K. Pendleton, Corp. Counsel (George L. Sterling and Fran-
cis Martin, of counsel), for City of New York.
   Morgan J. O'Brien, for Thompson-Starrett Co.

   DOWLING, J.   The plaintiff, a taxpayer, has procured a temporary
injunction restraining the defendants from accepting a bid for the work
of completing the substructure and erecting the superstructure of the
proposed municipal building, and from awarding any contract what-
soever for the work, and now seeks to have said injunction made per-
manent pending the trial and determination of this action. The ap-
plication presents unusual features, in that there is no claim made of

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

bad faith or official misconduct upon the part of the official whose acts are sought to be stayed; nor is it claimed that he is about to award the contract to any save the lowest bidder; nor is the responsibility, capacity, or integrity of such lowest bidder attacked; nor is the lowest bid claimed to be excessive. While, technically, this is a suit to prevent waste, under familiar and well-established principles, it must find its foundation in the doing or threatened doing of an illegal act by the public official whose acts are sought to be reviewed, for the courts will not interfere merely to substitute their judgment or discretion for that of the municipal officers whose duty it is to perform an act whose propriety is questioned. It is neither the right nor the duty of the court to substitute its judgment for that of the persons charged with the responsibility for the conduct of public affairs. The responsibility of the court begins and its duty is performed when it prevents the commission, by a public official, of any threatened act which is either in violation of law or without warrant of law.

Many of the questions which arise in this case would not be present but for the peculiar conditions attending the control of the public work involved in the erection of the large and costly municipal building, which is intended to furnish offices for the city's departments. The Legislature of this state, by chapter 670, Laws 1907, entitled "an act to authorize the erection, furnishing and equipment of a municipal building, at the Manhattan terminal of the New York and Brooklyn Bridge, in the city of New York," removed from the control of the borough president of Manhattan, who, under the charter, would have been in control of the work, all supervision over the construction of this building, and transferred the same to the commissioner of bridges, who was to act with the approval of the board of estimate and apportionment. The plaintiff complains of this legislative enactment, and there is no doubt that in its practical operation it has produced results perhaps not contemplated by the Legislature, and it has given rise to a conflict of authority, the more to be deplored, as the dispute has cast doubt upon the sufficiency of certain methods used in the construction of the foundations for the building. But, in my opinion, the act was clearly constitutional and was a valid exercise of the legislative power. The considerations which may have moved the Legislature to pass the enactment do not appear, nor are they material to the present consideration. It was doubtless thought that a building of the size of this and of steel construction would involve principles applicable to bridge construction, which would make the commissioner of bridges and the engineers of his department peculiarly qualified to pass upon the engineering problems presented by this unusual edifice, while, on the other hand, the veto power given to the board of estimate and apportionment insured supervision and scrutiny by the collective judgment of the city's highest officials. Unfortunately, from this situation has arisen a condition in which the right of the department of buildings in this city to pass upon the sufficiency of the plans and the safety of the construction proposed has been disputed, and the protest of said department against the erection of a building whose foundations did not go to bed rock unheeded. But whatever my personal views may be as to the effect of this legislation, so far as ousting the

superintendent of buildings of his power is concerned, I am bound to follow the decision of Mr. Justice Gerard, who, in the case of Wheeler v. City of New York, 122 N. Y. Supp. 627, after a full hearing and the presentation of affidavits as to the safety of the proposed structure, decided that all that was required was that the board of estimate and apportionment should approve the plans, and that the superintendent of buildings had no further jurisdiction in the matter. This disposes, therefore, of the objection that the work should not proceed without the approval of the superintendent of buildings. It leaves as well the opinion of the superintendent of buildings that the soil would be overloaded by the work as proposed, without any binding force, and leaves the responsibility for the safety of the structure to be erected upon the commissioner of bridges and the board of estimate and apportionment, who have exercised their power by preparing and approving the plans, and upon the Legislature which gave them that power. This court is now without any right to interfere with the plans for the foundations.

Objection is made to the proposed form of contract upon numerous other grounds. It is claimed that the commissioner of bridges was without authority to employ an architect to supervise the construction of the building. The act in question provides that the commissioner of bridges shall have power to employ an architect or architects to furnish the plans and specifications of the building, which said plans and specifications, before being acted upon by such commissioner of bridges, shall be submitted to and approved by the board of estimate and apportionment of the city of New York. This provision of law has been complied with. The commissioner of bridges has, however, proceeded further, and has sought to make a contract with a firm of architects, whereby they are to supervise the construction of the building, at a fee determined by a percentage upon the amount of work to be done and aggregating about $450,000. It is not disputed that the architects compose a firm of the highest standing, and of whose ability, integrity, and technical knowledge there can be no question. It is claimed, though, that the act is silent upon the power to employ any architects after the plans have been prepared, and that, therefore, inasmuch as the contract sought to be enjoined provides for supervision by the architects, it is unlawful. The reply to that is: Firstly, that the board of estimate and apportionment has approved of the employment of the architects by passing a resolution on February 19, 1909, providing for the issue of corporate stock of the city of New York to the amount of $2,700,000, whereof $450,000 was to provide for the payment of the architects' services in the preparation of plans and specifications and the supervision of the construction of said building, and that, therefore, the two agencies charged by the Legislature with the duty of constructing this building have co-operated in the employment of the architects; secondly, the purpose of the act was to authorize the erecting, furnishing, and equipment of the building in question. The commissioner of bridges was given power to employ an architect to furnish the plans and specifications, and his right to employ was absolute; the board of estimate and apportionment only had a veto power over the plans and specifications when prepared. While the act does not, by its terms, confer upon the commissioner the right

to employ an architect to supervise the work of construction, I am of the opinion that such right was within the plain intent and meaning of the act, and must necessarily flow from its terms.

It is matter of common knowledge that the services of an architect are required in the construction of every building after the plans and specifications have been prepared, to supervise the work of construction, and to insure its progress and completion in accordance with the plans and specifications, and in case they are not complied with to inform his principal of the fact. It does not seem possible to conceive of a situation where a building of any magnitude could be safely constructed without the services of a supervising architect. The city of New York has no official architect, nor does it appear that the department of bridges has any architects upon its pay roll, and, while it may well be that the engineers in its employ are thoroughly familiar with the steel construction which is to form the skeleton of the building, it could not be assumed, nor is it shown, that they are qualified to supervise the entire work upon the superstructure. It has been held, in Horgan & Slattery v. City of New York, 114 App. Div. 555, 100 N. Y. Supp. 68, that, inasmuch as the services of an architect require scientific knowledge and skill, it is unnecessary to have competitive bidding for such services, nor is a written contract necessary. An appropriation having been made by the board of estimate and apportionment to pay the services of the architects, it would seem, therefore, that the charter has been complied with. Furthermore, I think it may fairly be said that the absolute power given to erect, furnish, and equip a building carries with it the right to do all the things essential to the carrying into effect of the main purpose sought to be accomplished, and that under such a broad grant of power there is conferred the right to employ an architect to supervise the work. So, it was held in Peterson v. Mayor, 17 N. Y. 449, that, where general power to build a market was given, it was entirely within the province of the person in charge of the work to employ one of professional skill to prepare plans for the building. If the commissioner of bridges had undertaken to award a contract for the erection of this building, in whole or in part, without the supervision of an architect, I believe he would have been remiss in his duty to the city, and the awarding of a contract lacking such a clause could have been enjoined, as the city would then have absolutely no protection during the progress of the work from being imposed upon by the contractor. It certainly was never intended, as seems to be suggested by plaintiff herein, that the board of estimate and apportionment should personally be charged with the highly onerous duties of supervising the construction of a building such as this, involving the possession and exercise of technical skill of a high order.

The suggestion that there is a waste of public funds by the employment of the architects is answered by the fact that, firstly, the architects' employment was not illegal, and, secondly, that this is not a suit to enjoin payment to them of their fees fixed by their contract.

It is furthermore objected that the proposed contract is unlawful, in that it provides for payment to the contractor of a larger percentage upon the work done than is provided for by the charter generally. In the first place, I believe that under this sweeping enactment the char-

ter provisions with respect to the method of payment upon ordinary contracts have been abrogated. But, even if this be not so, the provision of section 422 of the charter (Laws 1901, c. 466), by its very phraseology, clearly relates to street improvement work and not to such work as that involved in the contract in question. Furthermore, I am of the opinion that, even under section 422 of the charter, 70 per cent., which the comptroller is directed to pay to the contractors, is a minimum payment only, and that the provision is intended for the protection of the contractor from unnecessary delay in his payments, and is not a prohibition against further payments by the city in a proper case. As a matter of fact, section 518 of the city ordinances provides that:

"In all contracts for work for the city of New York where provision is made for the payment of the contract prices, by installment, provision shall be inserted that the contract shall allow 10 per cent. of the contract price of the work actually done to remain as security until the whole work shall be completed according to the contract."

And the view which I have taken as to the applicability of section 422 of the charter to street improvement work only is confirmed by section 521 of the ordinances, which provides that, wherever assessment work is to be done for the city, monthly installments of 70 per cent. on the work performed shall be paid to the contractor, provided the amount of the work done on each installment shall amount to $1,500.

It is further objected that the clause AA of the contract is illegal in calling for bids in the alternative, whereby bidders were asked to bid for furnishing the work, using either tile arches or reinforced concrete slabs. But the bids called for were to contain not a single price for furnishing either material, the choice to be left to the commissioner of bridges or some other person, but separate estimates of costs for each of the two classes of work. It does not appear that there is any other satisfactory method of securing the fireproof construction desired save one of these two methods, nor is it claimed that either of these two methods is unsafe or improper to be used. All the bidders made their bids at a separate price for doing each class of work. What was condemned as illegal in the case of Gage v. City of New York (decided by me) 110 App. Div. 403, 97 N. Y. Supp. 157, was a form of contract by which bidders were required to submit bids for one price for the furnishing of either of two different classes of material, where there was a material variation in cost. Under such a situation of affairs, obviously, the city would be the loser, as it would be paying for the higher grade of materials when it might conclude to use only the lower. It would as well be unfair and open the door to fraud by allowing a bidder, who knew the intentions of the supervising officer with respect to the materials, to submit a bid based upon the cost of the lower grade of material, while his competitors, acting in good faith, but without that information, would be compelled, in order to protect themselves, to bid upon the basis of furnishing the higher grade material. That is not this case, and I do not see how the city could fairly have provided in any other way for the use of either of these methods

of construction, choosing either the more economical or the more serv-iceable, as it might thereafter determine.

It is objected that the contract is illegal, in that the granite specifications are so drawn as to preclude competition. I think this contention is overwhelmingly negatived by the affidavits in opposition and by the fact that numerous samples were on inspection for examination by prospective bidders, and any material equal to any of these samples, it was stated, would be accepted by the city.

It is objected that the specifications with respect to the fireproofing of the woodwork, for the filteration of water, and for enameled electric light wire conduits are illegal. I am unable to find any justification for the criticism of the specifications in these regards. They are but small items in the entire construction, and the purpose seems to have been to afford as wide a scope for competition as possible, and to insure only the furnishing of articles which would meet reasonable requirements and serve the purposes for which they were intended to be used.

The other objections raised by plaintiff are embraced in the general objection of lack of power upon the part of the commissioner of bridges and of the absence of the approval of the superintendent of buildings. The principles of law applicable to this class of cases are well settled. To justify the granting of an injunction it must clearly appear that the official act complained of was illegal; the plaintiff's right must be certain as to the law and the facts, and there must be a clear violation of law. Beginning with Talcott v. City of Buffalo, 125 N. Y. 280, 26 N. E. 263, and continuing down through every case decided by the Court of Appeals since that time, it has been held that before a plaintiff in a taxpayer's action can be given relief by way of an injunction against the acts of an official it must appear that the acts complained of are without power, or that collusion, fraud, or bad faith amounting to fraud exists. These are the only eventualities in which such relief can be given. In this case not only is there no charge of bad faith or fraud, but every objection which is made seems to be directed to action on the part of the commissioner of bridges, the effect of which has been and will be to safeguard the city's interests and to insure an honest performance of the city's contract. A responsible and competent contractor has made a bid, based upon the fullest plans and specifications prepared by competent architects and as a result of public letting, in response to which seven bids were submitted; the standing and reliability of all of the bidders being unquestioned. Here is presented no case of collusive bidding, of extravagant cost, or of an attempt to award a contract to other than the lowest bidder. It is unfortunate that this great improvement should, at its inception, be criticised because of a proposed change in the plans for the foundation work, by which three corners of the building are to be carried to bed rock and the fourth is to rest upon a sand foundation. But that is a question which does not affect and should not affect the contract now at issue. The work upon the foundations is not to be done under this contract, but has been progressing under a separate and independent contract with third parties, and has no relevancy to either the sub-

structure or the superstructure work. All that the successful bidder under the contract proposed to be let can require of the city is that it shall turn over to him the building with its foundations brought to such a level as his contract requires it shall be so furnished, and from that point upwards is his responsibility, and only from that. As the contractor for the substructure and superstructure has no responsibility for or participation in the foundation work, and as it in no way concerns him, I do not see what relevancy any proposed changes in the foundations have to this proposed contract. The impression was made upon me at the argument that if the plans for the foundations were changed the change might in some way relieve the contractor for the substructure of some of his liability to the city; but, after a most thorough examination of the papers, I am unable to find even a plausible suggestion of any effect such change may have.

As to the question of the safety of the foundation work, that is a matter with which the commissioner of bridges and the board of estimate and apportionment must deal, when any change proposed in the foundation plans shall come before them. It is not involved in this proceeding, nor can the court decide it here.

The plaintiff's case has been presented with great thoroughness and ability, and the very learned brief of plaintiff's counsel has called attention, it would seem, to every possible feature of this proposed contract which is open to criticism; but, after the most careful consideration given to his allegations and arguments, I am unable to find any foundation for the granting of injunctive relief herein.

Motion denied.