F. W. BUSCH et al., Appellants, v. JOINT DRAINAGE DISTRICT No. 49-79 OF WINNEBAGO and HANCOCK COUNTIES et al., Appellees.

STATE ex rel. J. W. BUSCH et al., Plaintiffs, v. DISTRICT COURT OF WINNEBAGO COUNTY et al., Defendants.

J. S. GETTIS et al., Plaintiffs, v. DISTRICT COURT OF WINNEBAGO COUNTY et al., Defendants.

DRAINS: Construction—Contract—"Sand" Clauses. When the presence of quicksand is apprehended, but practically undeterminable as a matter of fact, a contract and the proceedings preliminary thereto for the construction of a public drainage improvement may validly carry a provision relieving the contractor of his obligation to complete the work under his original bid in case quicksand is encountered, and enabling the public authorities, in such contingency, to take over and complete the work without further bidding.

*Appeal from Winnebago District Court.*—M. F. EDWARDS, Judge.

MAY 13, 1924.

REHEARING DENIED SEPTEMBER 20, 1924.

THE first above entitled action is an action in equity by certain taxpayers against the joint drainage district, certain county officers, the contractors, the bonding company, the engineer for the district, warrant holders, and others. The issues and facts will be given in the opinion. With said case were consolidated the two certiorari cases entitled as above. The certiorari cases were brought in this court, to review the action of the trial court

in rendering the decree in the equity case, and were brought because of motions by appellees in the equity case to dismiss the appeal. The plaintiffs in certiorari are landowners in the drainage district, and some of them are plaintiffs in the equity case. The abstract of record in the equity case is treated as the abstract and return in the certiorari cases. In the equity case, the plaintiffs appeal. The judgment is affirmed. In the certiorari cases, the proceedings are—*Affirmed*.

*E. A. & W. H. Morling, T. A. Kingland,* and *Meighen, Knudson & Sturz,* for appellants.

*Senneff, Bliss, Witwer & Senneff, Stipp, Perry, Bannister & Starzinger, Tom Boynton, W. H. Ramsay, Jensen & Osmundson, J. W. Henneberry, Oswald Maland, Dunn, Bryant & Clough,* and *T. J. Enright,* for appellees.

PRESTON, J.—The record is voluminous. Many questions are argued. Counsel for appellants state in argument that the principal controversy is over the so-called "sand clause" and one or two other questions related thereto, which are argued together. These are the questions most elaborately argued by counsel upon either side. This being so, we shall attempt to abbreviate the issues, findings of fact, and our conclusions with reference thereto, omitting for the present the more seriously controverted propositions; otherwise it will be impossible to keep the opinion within a reasonable length. It seems to be advisable not to discuss some of the preliminary and other questions raised, at any length, but to decide the case on the merits.

The district comprises about 6,000 acres, much of it low, wet land. This land is owned by about 70 different landowners, 19 of whom are plaintiffs in this case. Drainage is needed and desired. The project was practically completed before the litigation was instituted. About $5,000 was required to complete it. In February, 1917, the joint boards awarded the contract to defendant Berkland & Littell, for $41,000. Estimates were given and warrants issued to the amount of something over $101,000. The open work was to have been completed on or before September 1, 1917, and the tile work, January 1, 1919.

On the face of it, the extra cost seems unusually large. But it is contended that, because of the serious obstacles encountered, it was justified, under the "sand clause" in the specifications and notice of letting bids, which were made a part of the contract; that in this emergency the officers, engineer, contractors, and those having to do with the project, acted in good faith; and that the expenditure was necessary, to save what had already been expended and to carry through the project, and for the best interests of the district, the landowners, and the taxpayers.

Plaintiffs allege that the contractors and officials in collusion began a course of making pretended and illegal estimates and payments, and the issuing of illegal and void warrants to the contractors for work and labor purported to have been done, and for the purported actual cost and expense in doing the work with a percentage additional, and other unnecessary expenses and claimed overhead; that these payments were far in excess of the amount for which the contractors agreed to do the work, and to which they were entitled; that the payments were not made according or pursuant to the provisions of the contract or the terms thereof; that said payments were purported to be made by warrants drawn by one of the auditors upon the funds of the joint district, which warrants were payable to the contractors and other persons, and have been delivered to them and are outstanding; that said warrants have been presented to one of the treasurers, and by him registered and marked "not paid for want of funds."

It is further alleged that the "sand clause" in the notice is illegal and a fraud; that by it open or fair competition is rendered impossible; that contractors and taxpayers can have no knowledge of the basis upon which bids are being made, or of the approximate cost of the work, if made upon a contract containing such a provision; that the provision is a fraud upon bidders and upon the district and taxpayers, and is illegal, contrary to public policy, and beyond the power of the boards or engineer to make or carry out; that the "sand clause" in the specifications and contract is also unauthorized and illegal.

It is further alleged that, after a large part of the warrants

had been issued, commissioners to estimate benefits made an apportionment in the sum of something more than $203,000; that objections were filed to the proposed assessments, but with modifications they were approved and ordered levied; and that plaintiffs have appealed, and their appeals are now pending in the district court. It is further alleged that such special assessments have been entered upon the tax books, and collections will be enforced, unless restrained, and the proceeds illegally and fraudulently used for the payment of illegal warrants; that defendants have negotiated for the issuance of drainage bonds to raise funds to pay the warrants, which will be issued, unless restrained; that the present engineer is attempting to continue the work of construction by hiring day labor and making illegal contracts; that defendant boards have now undertaken to declare a forfeiture of the contract for work unperformed, and are issuing drainage warrants therefor, and without letting any contract, and are issuing warrants for other claimed expense, which it is proposed to pay from the proceeds of said assessments against the lands of plaintiffs; that they are proceeding without advertising for bids or letting any contract; that there were no unusual or unforeseen difficulties encountered; that plaintiffs had no knowledge of the acts of defendants relating to the warrants until the fixing of the assessed benefits.

It is further alleged that the engineer entered into collusion with the contractor in the early part of 1917, and began a course of making illegal estimates as a basis for issuing illegal and void warrants to the contractors, and that the other defendant·officers, without authority of law, attempted to ratify said illegal acts, and did aid and abet in the issue of warrants referred to; that the joint boards are under the control of the defendant contractors and engineer, and have misrepresented the drainage district and have perverted their powers and authority for the benefit of the contractors, and have not exercised the power and authority required by law for and in behalf of and to secure the rights of plaintiffs and other taxpayers, and have failed or neglected to claim and enforce the rights of plaintiffs and other taxpayers; that, by reason thereof, plaintiffs claim and exercise the right of bringing this suit in their own behalf

and in behalf and for the benefit of the joint drainage district and all of the taxpayers; that plaintiffs have no adequate remedy at law or by appeal; and that, unless defendants are enjoined, plaintiffs will be subjected to a multiplicity of suits, and will suffer irreparable damage: and they offer to do equity. It is prayed that all special assessments against plaintiffs' lands and all other lands in the district be adjudged to be illegal, void, and canceled; that the warrants issued to the contractors be so adjudged and canceled, and that they be required to surrender the same into court for cancellation; that the defendant engineer and auditors be declared to be without authority to issue the estimates and warrants set out; that the defendant boards, auditors, and treasurers be perpetually restrained from paying said warrants or taking proceedings looking to the collection of said special assessments, or from issuing evidence of indebtedness on account of said alleged work performed by the contractors or others, or by the engineer.

Those of the defendants who appeared and answered, many of them filing separate answers, admitted the publication of notice of letting; that the contract was awarded; and that certain warrants had been drawn, but say that this was done under the direction of the supervisors. They admitted that they had forfeited the contract, and that this was before the commencement of this action, and that, since the forfeiture, the supervisors had been completing the improvement as provided by law; that the officers have apportioned to the lands in the district the cost of construction and damages in the amount of $203,000, as alleged, and that plaintiffs have appealed from such apportionment, and that such appeals were taken and docketed according to law, before the commencement of this action. They allege that the same questions are therein raised as are raised in this case, and that therein plaintiffs have an adequate remedy, and it is exclusive; that plaintiffs have elected to pursue such appeals as their remedy; that defendants, in all their acts and doings, at all times acted entirely in good faith, without fraud or collusion, and strictly in accordance with law.

It is further claimed by appellees that a number of the warrants which it is sought to cancel were warrants that were issued

for work done under the contract price of $41,000, and not for work done under the "sand clause," and that plaintiffs have not pointed out which warrants they seek to cancel; that not all the warrant holders are made parties to this action. In answer to this, appellants say that the excess of about $60,000 should be covered back into the treasury, and that the balance of the $41,000, after deducting all the drainage district expense in completing the work, should be held subject to an adjudication as between the warrant holders and the contractors; that the warrant holders and contractors should be remitted to their right to bring an action to have their respective claims to this balance of the fund adjudicated, because the court cannot in this case determine possible equities as between the warrant holders. Appellees also contend that plaintiffs are estopped, because they had knowledge that the engineer and officers were proceeding under the "sand clause," and not under the other provisions of the contract, as to the extra payments, and made no objection thereto. There is a conflict in the evidence on this question, plaintiffs' evidence tending to show that they had no knowledge thereof until after the estimates and payments had been made. Defendants' evidence tends to show that they did have knowledge, and made no objection; that it was a matter of common knowledge; and that the quicksand emergency was encountered while working on the lands of some of the plaintiffs and the landowners.

Appellants concede that some of the questions presented here could be raised on the appeal, but say that other questions herein, such as estoppel, wrongful disbursement of funds, and so on, are not, or may not be, involved in the appeal, and that a taxpayer's action in equity, where all questions may be determined, is proper. We are inclined to the view that plaintiffs pleaded themselves into equity; and while, for the most part, plaintiffs failed to establish the issues presented, they were granted some relief, by canceling some of the estimates, as hereinafter stated. At any rate, the trial court found that plaintiffs were entitled to maintain the action, and from this, defendants have not appealed.

The trial court also found that the evidence fails to show

that there was any fraud, legal or actual, on the part of the defendants or any of them, and fails to show that there was any wrongdoing or official misconduct. It found also that the contract was entered into in good faith by all parties; that the contractors claim to have suffered a loss of at least $8,000, and that of this the landowners have the benefit; that the contract was not contrary to public policy, or *ultra vires;* and that the boards had authority to make such a contract containing the sand clause. The trial court granted plaintiffs partial relief in this: That estimates amounting to about $1,500 were duplicates, and given by mistake. This was by the engineer who succeeded Gjellefald. These estimates were annulled, and it was decreed that, if a warrant was issued thereon, same should be returned by the contractor, or the funds received refunded, or recoupment be made for that sum from money still due the contractor.

The foregoing is, in the main, a statement of the issues and findings of the trial court. As to these, we reach the conclusion that, under the evidence, such findings are correct.

1. We shall now proceed to the main point in the case. As said, this and some other questions are so related to each other as that they have been argued together, and we shall so consider them. We do not understand appellants to contend that the contract in its entirety is invalid. The real contention, briefly, is that the "sand clause" is contrary to public policy, and was inserted without authority of law, and that all estimates and warrants and payments made thereunder were invalid. They also plead that no unusual condition arose, and contend that, even so, the contractor was bound to complete the project at the contract price of $41,000.

On the other hand, appellees contend that the boards had authority to make such a contract; that the anticipated condition arose; that the contractor gave notice, and the engineer took charge and proceeded, and that the work was done, estimates made, and warrants issued strictly in accordance with the contract; that, while the extra expenditure is large, it was justified by the conditions; and that, acting in good faith, they proceeded for the best interests of the district and the landowners. After the contractor struck quicksand, and after the engineer had

taken charge, the 15 per cent above cost was not, in all cases, exacted or paid to the persons doing the work. While the contractors were on the job, after the engineer took charge, they were not paid any compensation. The engineer resolved all doubts in favor of the district. What happened was that the engineer, after taking charge of the work, carried it on under the cost plan, using practically the same force and the same equipment. The matter was taken up by the contractor, engineer, and the boards. The engineer concluded to keep the contractors and crew on the job to do the day work, because he knew of no one who could do it as well, and he did not wish to get a new crew. It was the judgment of the joint boards that they would be able to get the work done cheaper in this way than to advertise the work and have it contracted for at a definite price,—such was their experience. When the work in the quicksand was taken over by the engineer, it was not expected by him or by the boards that the bad work would be of long duration. The boards went out and looked the situation over. Comparison with other districts shows that the work in this district cost less per acre than in any other district in the locality except one. Some of plaintiffs' witnesses say, on cross-examination, that the cost of the improvement was fair, and that the percentage of overrun was not excessive. There is no doubt but that the obstructions were serious, and such that the contractor refused to proceed, and gave notice, under the provisions of the contract. Some of the witnesses testify that, when they got into the quicksand, it was the worst job they had ever seen. As completed, it is a good job. The work was done under the provisions of the contract, and in a substantial manner, and at as low a cost to the landowners as the prevailing labor and other costs at that time permitted, under the attending circumstances. The work was done under the direction of the engineer for the district boards. The contractor gave a bond in the penalty of $10,000, but afterwards became insolvent, as did the surety on his bond. The supervisors were aware of this. No cash deposit was made. Under the circumstances, it would have been a useless proceeding to begin suit on the bond. The contract has been terminated under one of the alternative provisions of the statute,

and in compliance with the statute, Section 1989-a10, Code Supplement, 1913. It is not entirely clear when this was done. If the record shows, we do not find it. At any rate, the contractor proceeded no further under the contract after the engineer took charge, after quicksand was encountered. The effect of what was done was, therefore, to terminate the contract. From that time on, the work was done by time, at cost plus a percentage not exceeding that provided. The work might have been relet by the board by advertisement; but this method was not obligatory, as neither the statute nor the contract compels the board to relet the work, and the evidence shows that it could not have been done as cheaply or as advantageously to the landowners as it was done. Considering all the circumstances, the cost to the landowners is not above the benefits conferred by the improvement. The ordinary soil conditions, as well as the possibility of striking quicksand, were recognized and considered by all bidders at the time of presenting bids, and it is shown that all bidders bid on the same proposition. The contractors did the work under the contract scheduled price, except where quicksand and cavey conditions were encountered. There was water-bearing soil. During the work, there were large holes, and water was troublesome. From the character of the soil and the cavings, the ditch was extended to an unusual width, in places from 70 to 100 feet. The quicksand, as one witness puts it, flowed and boiled up from the bottom like water; the cavey material was practically in solution, constantly sloughing and caving at the sides. We shall not go into further details as to the conditions nor the evidence, which shows that this condition could not have been discovered until it was reached during the construction. The evidence is that the quicksand was in spots, and that, if boring were done, even if the instrument should strike the quicksand, it was so thin that it would not stick to the auger,—the material would run off the auger. It is doubtless true that it was anticipated that such a condition might be discovered as the work progressed, and we assume that that is the reason the "sand clause" was incorporated in the contract. It appears that in that part of the state other contracts for drainage projects included such a clause, and for the reason stated.

We do not understand that this was done so much for the benefit of the contractor as that the landowners might have the work done at actual cost. It is argued by appellees that, under the circumstances, but for such a clause, bidders would increase the amount of their bids to cover possible losses, and that, in that case, if quicksand was not encountered, the landowners would thus pay more. Under these clauses, digging in running quicksand and cavey material would be done by day labor, without profit to the contractor. This is what was done. The evidence shows that one purpose of the "sand clause" was to encourage contractors to bid, and that without it they would not get contractors. The contractor testified that he saw the specifications and the "sand clause" in the notice, and that these caused him to bid; that, if they had not been there, he would not have bid. Under the authorities cited by appellants, it may be that, but for such provisions in the contract, the contractor would be bound by his contract, and required to finish the work, even if at a loss. It is appellants' contention at this point that, the "sand clause" being invalid, the contractor was bound to finish the work at the contract price of $41,000.

We have gone into the details somewhat; but necessarily the foregoing is, at best, but a summary, and our conclusions from the evidence. Incidentally we have referred, in passing, to some of the contentions of the parties.

2. Berkland & Littell were the successful bidders, and, as said, were awarded the contract, for $41,000. The contract specified the work to be done: main 7,200 feet, open ditch 12 feet, base, slope, etc. It gave the number of cubic yards approximately; average cut 6.49; maximum cut 11.50; bulkhead, etc. The work on open lateral was specified. The tile work was also described,—so many feet of 15 inch; intakes; and so on.

Section 17 of the engineer's specifications on file provides:

"Where quicksand is encountered the engineer shall be immediately notified and he shall examine the work and order in writing such work as is necessary to thoroughly protect the tile line. The contractor may submit a bid in writing and the supervisors may accept this bid or order the work for this extra work done by time in which case the contractor shall receive cost plus

15 per cent of all labor and material. Said extra work shall be done under the direction of the engineer.''

The auditor made up the notice of letting, which was duly published, and contained this provision, among others:

''On all the tile drains, the right is reserved that, from a notice in writing from the contractor that running sand or very cavey material is encountered, the engineer in charge, if he finds it necessary, shall have the right to take charge of the work and construct, by day labor, as much of said work as he may deem necessary, without any cost to the contractor, or the contractor to receive any pay for said work so constructed.''

As said, these were carried into and made part of the contract. It is complained by appellants that this notice is not worded exactly like the specifications, and that the auditor had no authority to make any change. Of a somewhat similar provision of the statute in relation to improvements by cities, we have said that it was not necessary that the notice state all the details, and that its office is to apprise the public and persons interested of its general character, and to give opportunity for investigation and protest to those desiring to make it. *Nixon v. City of Burlington,* 141 Iowa 316, 323; *Royal v. City of Des Moines,* 195 Iowa 23, 30. The specifications and contract are for other purposes, and govern the duties, obligations, and rights of the parties. In *Horton Township v. Drainage District,* 192 Iowa 61, 65, we said:

''The notice prior to an original contract relates to the character and extent of the work proposed, and not to the terms of the contract. Bids are made and the original contract drawn after the notices, without knowledge or notice to the landowners as to the particulars regarding such matters. Section 1989-a10.''

In drainage cases, Section 1989-a8, Code Supplement, 1913, provides that the board shall cause notice to be given, and what the notice shall contain.

Referring now to the ''sand clauses.'' One of appellants' propositions is that, with the ''sand clause'' in the contract, the work could not be, and was not, let on competitive bids, or to the lowest responsible bidder, as the law requires. The contention is that a contract cannot be upheld under proposals which

do not require competitive bids upon the same basis, and that there is no competition among bidders unless the proposition is the same for all bidders. We do not understand appellees to controvert this last proposition; so that it may be conceded, without citing the cases. As to this, and the claim that there was no authority in law authorizing the boards to include the "sand clause" in the contract, it must be remembered that this provision was in the published notice to bidders. The result was that all bidders did bid on the same proposition. We think the statute in respect to letting the contract to the lowest responsible bidder was complied with. The statute, Section 1989-a46, Code Supplement, 1913, provides that the provisions of the act shall be liberally construed to promote the ditching, draining, and reclamation of wet land, etc. Section 1989-a8, supra, provides that the work is to be let by the board, which shall cause notice to be given, in which notice "they shall specify the approximate amount of work to be done in each section and the time fixed for the commencement and completion thereof;" and the work shall be awarded to the lowest bidder, etc. There is no other provision of the statute in regard to the contract, or provision as to what the contract shall or shall not contain. The statute is silent as to such a contingency as happened here. We think there is no prohibition in the statute that prevents the boards from putting into the notice or inserting in the contract a "sand clause" provision, as was done here. In *Bass Foundry & Mach. Wks. v. Board*, 115 Ind. 234, 243, the court said:

"The statute makes no provision for such a contingency as has happened in the present case, yet it is within the experience of all that such contingencies are likely to happen in the construction of public as well as private buildings. It would hardly do to assume that the legislature failed to consider that such a contingency might happen, or that it was intended in case it did happen, at whatever stage of the work, that the hands of the county commissioners should be tied until new plans and specifications were adopted and a new contract let. In the absence of any provision in the statute for such a case, we must assume that it was intended that the commissioners should exer-

cise their best discretion in each case, according to the circumstances that should exist at the time."

Section 1989-a10 provides, in substance, that, if the contractor fails to perform the work, the cash deposited by him shall be forfeited, or recovery may be had on the bond for damages; or the board may cause the uncompleted work to be done, paying therefor out of the balance of the contract price, if any, and, if such expense of completing the work exceeds such balance, the board may cause an action to be brought on the bond for such excess. We have seen that no cash deposit was made, and it would have been a useless proceeding to have declared a forfeiture and begun an action on the bond. This being so, failure of the boards to formally declare a forfeiture and bring suit on the bond could work no prejudice to plaintiffs, or give them any additional rights by reason of such failure. Under the circumstances, and in the emergency, we think it was the duty of the board to have the work done as economically as possible. True, the drainage law, Section 1989-a2, requires the board to appoint an engineer, who is to report on the probable cost of the work. This was done as to the ordinary digging; and, but for the unforeseen emergency encountered, and the "sand clause" in the contract, the price or cost fixed in the notice, specifications, and contract would have been controlling and binding upon all parties. While the work done after the quicksand was encountered is referred to in arguments as extra work, it does not, strictly speaking, come under the term "extras." True, it is extra work; but it is so because of the emergency, and was done under the provision of the contract now being considered. Some of the cases cited by appellants do not contain a provision of this kind. We shall refer somewhat fully to some of the cases cited and relied upon by appellants, and cite the others.

In *Bolton v. Gilleran*, 105 Cal. 244 (38 Pac. 881), the specifications provided that, if the soil was unfit for foundation, planking and concrete must be used. The contract gave different prices per lineal foot, depending upon whether such materials were necessary; but the amount of work requiring such material was not fixed, but left to the superintendent of streets. The court said:

"A mere glance at these proceedings shows that the amount of tax which is to be imposed upon the lands for the expense of the improvement was not determined by the supervisors in their award of the contract, but that they gave to the superintendent of streets the discretion to determine that amount to the extent of fully one third thereof * * * What constituted an 'improper' nature for a foundation, or what would be a 'sufficient depth' to which it was to be removed, or the place in which the foundation was not 'sufficiently secure,' were elements of uncertainty, which prevented any previous determination of the cost. It is not sufficient to say that the character of the ground in which the sewers were to be constructed was not known to the board of supervisors. It was their duty to cause its character to be examined before ordering the improvement, and not to leave the character of the improvement to depend upon the subsequent examination by some other officer. * * * A contract in terms like the present gives to the superintendent of streets the opportunity to make the cost of the improvement greater or less, according to his desire to favor or injure the *contractor*, vests him with an illegal discretion, tends to prepare the way for an unfair assessment, and opens wide the door to fraud and favoritism. If there is any *profit* in doing the work at the higher figure, the natural effect of such a contract is to induce the *contractor* to put planking and concrete upon the whole line of work, while, if it is without profit, he would be disposed to consider the entire foundation stable. Under such a notice for proposals, bidders can have no intelligent basis upon which to calculate the cost of the work, and all competition for doing the work is practically destroyed. * * * 'Every such covert, irresponsible, discretionary power as here assumed is wholly inconsistent with a proper exercise of the high and sovereign power of taxation or eminent domain. It might be used, and it does not affect the principle whether it was so used or not, as a cover to an unfair estimate or assessment. It might be used as the instrument of favoritism in letting the contracts for the work.' "

The doctrine there announced is wholesome. The case is more or less in point, but not directly so; because, among other reasons, there was no provision, as here, that the work should

be done at cost. There are some other distinctions. In that case, reference is made to the fact that there was an opportunity to favor or injure the contractor, and for profit to him. Not so in the instant case, because the work was taken out of the hands of the contractor, and the work done at cost, with no chance to injure or favor the contractor, or that he should profit by the extra work.

In *McBrian v. City of Grand Rapids*, 56 Mich. 95 (22 N. W. 206), the court said:

"What the board is required to do is for the benefit of the public; the object being to invite competition and prevent favoritism and fraud in awarding contracts for public works. It was not the intention of the legislature to leave it discretionary with the board whether the contract should be made with the lowest responsible bidder. * * * The only discretion the board is permitted to exercise is in rejecting bids. * * * But if the bids are rejected, the board is required to readvertise for proposals as often as may be necessary. * * * In preparing the plans and specifications for a public improvement which the board of public works are authorized to make, it is the manifest duty of the board to give a detailed statement of the plan of the work, and of the kinds and quality of the materials required, for the purpose of affording to bidders data from which to estimate the cost of the work and materials, and inducing fair and honest competition. It may frequently happen, in the construction of sewers, that quicksand or rock may be encountered which would largely increase the cost of construction, the extent of which it may be impossible to ascertain in advance. In preparing *specifications* and *contracts* it *may be proper to mention such contingencies,* and to provide for payment for such *extraordinary contingencies* at what the *extra work* required is *reasonably worth* by the cubic yard. But such a course can never be necessary where, by the exercise of reasonable diligence and suitable investigation by the city surveyor or other proper official, the condition of things affecting the cost of construction can be *ascertained beforehand,* and can be justified only because the true condition of things cannot be thus ascertained. * * * In the *Brady* case, the price for removing rock, if any should be found,

was called for in the advertisement, and was included in the bid; but the quantity was not ascertained, so that it could not be known what the work would cost at the contract price. In this case both quantity and price are omitted, and no data whatever exist from which to ascertain what would be the cost of the work so far as rock excavation is concerned. It was to be at a price to be named in the contract. By whom was the price to be named? Was the board of public works to name it, or was the *contractor*, or was it to be a matter of *agreement between them?* In either case there would be no competition, no bidding, no proposals, and consequently no authority for the board to contract. If, therefore, an independent price for rock excavation had been agreed upon *after the bid was accepted,* and specified in the contract, the payment thereof could not have been enforced because of the illegality. If a failure to observe the law requiring contracts for doing the public work to be let to the lowest responsible bidder, or if a partial compliance can be sanctioned, then there is no safeguard to the public interests in the requirement of the statutes. A small and comparatively unimportant portion of the proposed improvement may be advertised, and competition invited, and the great bulk be left to *private agreement* between the *board* and the *contractor.*''

Some aspects of that case are quite different from the situation now presented. In the *McBrian* case, the contractor himself was seeking to recover for such extra work, and the extra work was the subject of agreement between the board and the contractor. Such is not the situation here. That case recognizes the doctrine contended for by appellees and sustained by the authorities to be cited, that the board may provide for extraordinary contingencies for extra work where, by the exercise of reasonable diligence, the proper officials cannot ascertain beforehand the true condition of things, or the extent or cost of the extra work. It may be observed, too, that, in the case cited, the extra work was the subject of agreement after the contract had been let. In the instant case, the extra work and the emergency were incidental to the work covered by the specifications and contract.

Appellants also cite *Frame v. Felix,* 167 Pa. St. 47 (27

L. R. A. 802), and *Coggeshall v. City of Des Moines,* 78 Iowa 235, as following the *Frame* case; also, Section 31, Article 3, of the Constitution of Iowa, which declares that:

"No extra compensation shall be made to any officer, public agent, or contractor, after the service shall have been rendered, or the contract entered into," etc.

They also cite *McGovern v. City of New York,* 234 N. Y. 377 (138 N. E. 26), and *Gordon v. State of New York,* 233 N. Y. 1 (134 N. E. 698), where it was held that where, because of the increased price of labor and materials because of the war, a later contract was entered into, increasing the amount, there was no such emergency as to relieve the contractors from burdens not foreseen when the undertaking was begun. Other authorities cited are 3 McQuillin on Municipal Corporations, Section 1207; 4 McQuillin on Municipal Corporations, Section 1872. Other cases cited, but perhaps not so nearly in point, are: *In re Emigrant Indus. Sav. Bank,* 75 N. Y. 388; *Gage v. City of New York,* 110 App. Div. 403 (97 N. Y. Supp. 157); *Chippewa Bridge Co. v. City of Durand,* 122 Wis. 85; *Humboldt County v. Ward Bros.,* 163 Iowa 510, 519; *Columbus R. P. & L. Co. v. City of Columbus,* 249 U. S. 399. The last case, and perhaps some of the others, hold that one who charges himself with an obligation possible to be performed must abide by it unless performance is rendered impossible by the act of God, by the law, or by the act of the other party; and that unforeseen difficulties will not excuse performance. Some of the additional cases last cited are not, we think, contrary to principles contended for by appellees.

On the other hand, appellees cite a number of cases which we think are more nearly in point, and applicable to the situation here presented. In *Ippolito v. Borough,* 94 N. J. L. 97 (109 Atl. 337, 339), the court reviews some of the cases on this subject, and quotes from an Indiana case with approval, as follows:

"The statute referred to was intended as a safeguard of the public interest, and we are disposed to enforce it according to its spirit. We do not think, however, that it was intended to apply to a case like this, where a sudden and unforeseen emergency confronts a board of commissioners after it has regularly let a contract for a public building, and where it is to be de-

sired to avoid delay, and not to put a new contractor on the work, but to have the work continued by the general contractor for the construction of the building. In such a case, where it can be said that the new work is but an incident of a work before regularly contracted for, and where it does not appear that the act of the parties was a mere *effort to evade* the statute, we do not think that the statute is applicable.'' *Board of Com. v. Gibson,* 158 Ind. 471.

In a Pennsylvania case, *Clark & Sons Co. v. Pittsburg,* 217 Pa. 46 (66 Atl. 154, 156), the contract provided that extra work should be paid for at a reasonable cost plus 10 per cent. It was claimed that the provision was invalid. The court said:

''The contract itself was awarded to the lowest responsible bidder, and, having been for the construction of a reservoir more than likely to require, from time to time, necessary extra work not definitely provided for in the contract, because not to be foreseen when it was executed, it would have been *improvident* on the part of the city not to have inserted the provision *limiting* the amount to be paid to the *contractor* for the same. By fixing the limitation on the amount to be paid for extra work that might be required, the city did about all it could have done to protect itself from imposition by the contractor in doing such work. It announced to the *bidders,* through its advertisement, what would be the definite *basis* of compensation for the same, and in bidding on the *general work* they knew exactly what profit there would be in the *incidents* to it, *designated* as *extra work.* If a city should not be permitted to insert in a contract for municipal improvements a provision for the payment for extra work becoming necessary as the general work progresses, but must always award the same to the lowest responsible bidder, after advertisement for proposals, there would be inevitable delay in the completion of the work called for in the contract, with no certainty of any saving to the city, but with likelihood of greater cost than if the extra work were done under a provision similar to the one in this contract; and if each item of extra work should be awarded to a separate bidder, the confusion to follow in the general work may be well imagined, even if the imagination of the distinguished counsel for appellee is stretched.

in likening it in his brief to 'the confusion of tongues that occurred in the construction of the Tower of Babel.' "

In *City of Chicago v. McKechney,* 91 Ill. App. 442, the court said:

"To have readvertised and let a new contract, the work having been partly finished, and new conditions arising for which the contractors were not responsible, would have been impracticable. It would have involved a practical abandonment of the contract, exposed the city to payment of damages, created confusion, litigation, and delay. The *emergency* which had arisen was *incidental* to the prosecution of the work. The new material encountered, called 'conglomerate,' *might not continue for a long distance.* It might be avoided by other changes in the grade or direction of the tunnel, which the commissioner of public works had power to make. The arrangement was not a new contract for new work, within the meaning of the statute, to cost more than $500. It was an agreement to pay a certain extra sum per cubic yard for excavation and extra masonry so long as the tunnel should continue in that particular material, which was *apparently uncertain.* If the price proved too high or the expenditure proved excessive, the city should have interposed, if it believed the arrangement improper. But instead of so doing, the city council expressly authorized the payments to be continued, indicating, at least, that it did not regard the price as excessive. * * * It is true the extra payment to which the contractors became entitled under the allowance made by the city's representative amounted in the aggregate to a large amount. But it is not shown to be more than the work was reasonably worth, nor is there any suggestion of fraud or dishonesty in making the agreement. There is no intimation that it was made with any other than honest motives."

The case seems to be quite in point. In the instant case, fraud was not established in the letting of the contract or in carrying on the extra work. It was shown that the extra work was done at a reasonable cost. It could not be determined how much of the quicksand and cavey condition there would be, either before the contract was let or when they got into the quicksand, or what the conditions would be. As said, it was expected

that the condition would not last long. Neither the amount of extra work required nor the cost could be determined in advance.

In *Board of Com. v. Gibson,* 158 Ind. 471 (63 N. E. 982), the board let a contract for the construction of a courthouse, the statute requiring that it must be let to the lowest bidder. During the work, the architect found that the character of the soil was such that the foundation ought to go deeper; and the board made a contract with the contractor, without taking bids for the additional work. After the work was done, the county sought to defeat the claim on the ground that it violated the law requiring such work to be done by the lowest bidder. The court said:

"This is practically an effort to set up the defense of *ultra vires* to a contract that has been fully executed by the opposite party. Such a claim, when, *ex aequo et bono,* the corporation ought to pay, is odious. The statute referred to was intended as a safeguard of the public interest, and we are disposed to enforce it according to its spirit. We do not think, however, that it was intended to apply to a case like this, where a sudden and unforeseen emergency confronts a board of commissioners after it has regularly let a contract for a public building, and where it is to be desired to avoid delay, and not to put a new contractor on the work, but to have the work continued by the general contractor for the construction of the building. In such a case, where it can be said that the new work is but an *incident* of a work before regularly contracted for, and where it does not appear that the act of the parties was a mere effort to evade the statute, we do not think that the statute is applicable."

Quoting from the case of *Bass Foundry & Mach. Wks. v. Board,* supra, the court said:

" 'Whatever may be said about the binding force and effect of contracts made by commissioners under the circumstances disclosed, certainly, where a county board, in pursuance of its duty to erect public buildings for the county, has proceeded regularly to a point where a contractor abandons the work while it is in progress, and then, in the exercise of its *discretion,* procures others to furnish money, labor, and materials, so as to carry the work forward to completion, the county cannot, after accepting and enjoying the buildings thus completed, refuse to repay the

money and the reasonable value of the labor and materials furnished at the request of the commissioners. The doctrine of *ultra vires* does not absolve municipal corporations from the principles of common honesty. When a corporation has received the money or property of an individual, under color of authority, and has appropriated it to its necessary and beneficial use, it will not be heard to assert its want of power to pay the value of what it has received and still retains. In such a case, where the initiatory steps have been taken which authorize a municipality to proceed with a public work, persons who furnish money, labor, or materials to the municipality, which are actually used in the work and retained by it, become equitably entitled to recover.' See, also, *Board of Com. of Gibson County v. Cincinnati Steam Heating Co.*, 128 Ind. 240 (27 N. E. 612, 12 L. R. A. 502) ; *Smith v. Board of Com. of Miami County*, 6 Ind. App. 153 (33 N. E. 243), and cases there cited. Where the parties act in good faith, the authority of the board to make changes without complying with the statute referred to should be determined, not primarily by the cost of the change, but by the relation that the change bears to the main work, and the circumstances that confront the commissioners when they order the change.''

The last two cases are not so nearly in point as some of the others. We take it they are cited by appellees to the proposition that in the instant case the boards had a discretion as to what should be done after the quicksand was encountered, and that they had a right to pay for such extra work on a *quantum meruit* basis. Appellees also cite *Horton Township v. Drainage District*, 192 Iowa 61, to the last point. We deem it unnecessary at this time to discuss these last two propositions or to determine them. The contract provided for such a contingency, and the contract was followed. In the *Horton* case, it was held that it was not *ultra vires* for the board to release the construction company and its cash bond from liability for failure to complete the original contract, by entering into a new contract.

From the foregoing it will be seen that the Supreme Courts of Illinois, Indiana, Ohio, Pennsylvania, and New Jersey have all decided that provisions such as we find here are legal and valid, under laws requiring work to be let to the lowest respon-

sible bidder, after taking competitive bids. We think that the doctrine announced in these cases is sound, and applicable to the instant case, and sustains the conclusion we reach.

It should have been stated that the contract contains the further provision:

"Should there be any difficulty between the parties hereto as to the construction of any of the terms or provisions of this agreement, including the plans and specifications hereinbefore made a part hereof, relating to the work to be done, such differences shall be referred to the engineer employed by the parties of the first part, in charge of the work, and his decision shall be final upon both parties."

There is some argument as to the force of this provision. We shall not stop to discuss it, except to say that the engineer, in good faith, determined, with the approval of the boards, that, under the contract and specifications, and because of the character of the work encountered, the extra work should be done on the day-labor plan. It was so done.

The contract also provides that the contractor shall at his own expense, remove all obstructions and do all clearing necessary for carrying on the prescribed work, and shall not be allowed any pay for work or excavation not embraced within the terms of this agreement, or not required by the specifications, maps, and profiles relating to said work now on file, etc. It is clear that this provision did not bind the contractor to do the extra work after the quicksand emergency arose, with the other work, for $41,000. The first part of the provision has reference to clearing, preparatory to commencing the work. The specifications, as before pointed out, provide for the extra work in quicksand and how it shall be done and paid for.

The opinion is already long. We have attempted to cover the controlling points in the case. We are of opinion that the decree of the district court was right. The equity case is affirmed, as are the certiorari cases.—*Affirmed.*

ARTHUR, C. J., EVANS and FAVILLE, JJ., concur.